OPINION
{¶ 1} Appellant, Mark Zappola, appeals from a judgment entry of the Lake County Court of Common Pleas, granting summary judgment in favor of appellee, OSI Sealants, Inc.[1] For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} Appellee is engaged in the business of producing adhesive sealants, such as caulk or glue. Appellee was insured by Wasau Underwriters Insurance Company.
 {¶ 3} Appellant commenced employment with appellee in April 1999, as a package handler, and he held this position throughout the course of his employment. Appellant was required to perform a variety of tasks, including operating machines that package the finished product.
 {¶ 4} Appellant spent much of his time operating the Prosys 4-up quart filling machine ("the Prosys"). As part of his position, appellant was required not only to run the Prosys machine but also to fix jams and other machine malfunctions.
 {¶ 5} The machine was purchased from the Prosys Division of Reagent Chemical Research, Inc. The machine channels adhesive sealant into cylindrical tubes in which the sealant is eventually sold. The sealant is channeled into tubes by a set of vertical cylindrical pistons/cylinders, which are near the top of the machine and held by a horizontal crossbar. The crossbar is located above the cylinders. Above the crossbar is the metal upper frame of the machine, which is approximately nine feet above the floor.
 {¶ 6} From the materials submitted by the parties, as part of the summary judgment exercise, we are unable to ascertain the precise structure of the machine and how it operated. No diagram or other schematic of the machine was made part of the record by either party.
 {¶ 7} On the day of the incident, the machine was operated without the small guard that kept the caps moving in the proper direction. The maintenance department was in the process of procuring a replacement. Appellant testified in his deposition that the caps jammed 104 times during his shift the day before the incident. According to appellant, when he reported the problem to appellee, he was told to "continue working and keep [the] production working."
 {¶ 8} The Prosys machine used compressed air to force the product from a reservoir, through plumbing, to the packaging tubes. In an affidavit, Jeff Schultze, an employee of Reagent Chemical, stated that he had learned that appellee had modified the machine. According to Schultze, "[a]s originally shipped to appellee, the [Prosys] provided air pressure to the reservoir lid via a connection from the main air manifold. The main air manifold was supplied by the Main Air Solenoid Valve. The solenoid valve was interlocked into the machine's emergency stop mechanisms, i.e., the solenoid valve dumped the reservoir head pressure when an [emergency stop] button was pressed or the safety gate was opened." Two of appellee's employees, visiting Reagent Chemical to review the machine, indicated to Schultze that, with the modification, the machine did not "dump" its stored energy when the emergency button was pressed. The crossbar continued moving upward, until the machine completed its cycle and stopped, placing the crossbar at the top of the machine in its "home" position.
 {¶ 9} According to appellant, appellee modified the machine in this way because the sealants manufactured were highly flammable. Appellant contends that appellee made the decision to use nitrogen, rather than compressed air, to force the product from a reservoir through plumbing and into the tubes, because nitrogen was an inert gas and less flammable. This modification bypassed the solenoid device that connected the gas source with the emergency stop button and the safety doors. Appellant alleges in his appellate brief that this modification allowed the crossbar to continue to move, even after all energy sources were disconnected, until it reached its "home position" at the top of the machine. Appellant failed to direct our attention to what portion of the record substantiates this claim. Further, appellant admitted that he did not know whether appellee knew that the condition was unreasonably dangerous and substantially certain to cause injury.
 {¶ 10} Appellant testified in his deposition that he felt "confident" operating the machine. He received safety training on the machine, including instruction on the operating procedures and safety functions, and he passed a test on the Prosys. Appellant also attended safety meetings regarding the machinery. Although management approached appellant numerous times to elicit comments and concerns regarding the machine, including one week prior to the accident, appellant never had any comments or concerns about the safety of the machine.
 {¶ 11} Appellant's complaint arose from an incident that occurred on February 16, 2001, when he was injured while allegedly attempting to clear a cap jam in the Prosys. The parties do not dispute that appellant's head became lodged between the horizontal crossbar and the upper frame of the machine, causing injury.
 {¶ 12} On that morning, the cap feed tray was having continual problems. Appellant testified that the cap feed tray was approximately two to three feet from the crossbar. He also stated that he did not need to and had never previously put any part of his body between the crossbar and the upper frame of the machine, to reach or clear the cap feed tray.
 {¶ 13} To fix the cap jam, appellant testified that he did not stop the cycle or press the emergency stop button.[2] Instead, appellant testified that the machine was already stopped due to the jam. Appellant "[o]pened the door, slid the ladder in, stepped on the second rung of the ladder, climbed up two rungs of the ladder and worked on the problem."[3]
Appellant stated that he attempted to fix the problem by reaching his arm into the machine. He does not remember what happened after that. He next remembers waking up at Metro Hospital in Cleveland. According to various witnesses, appellant's head became caught between the crossbar and the metal frame of the machine, approximately nine feet above the ground, and two to four feet from the cap feed tray.
 {¶ 14} Appellant does not recall reaching any part of his body between the crossbar and the metal frame. Although he stated he did not remember anything after reaching to fix the cap jam, he also stated affirmatively that he did not climb the whole way up on the ladder to the top of the machine and had never been on top of the machine before.
 {¶ 15} Appellant's co-worker, Al Barber ("Barber"), was the only witness to the incident. He had a different recollection of events. First, Barber indicated that he had seen appellant on top of the machine numerous times before. Barber testified that this was against company policy, and he stated he had warned appellant not to do that because their supervisor would get upset.
 {¶ 16} As appellant stated, Barber testified that a worker would have to get on the ladder to clear a cap jam. Barber, as well as Al Crawford ("Crawford"), another coworker, detailed the process required to fix a cap jam. Both men stated that one would have to first stop the machine, climb three steps up the ladder, and then reach his arm into the machine to clear the problem. Both men also indicated that clearing a cap jam does not require a person to put any portion of his body between the crossbar and the top frame of the machine.
 {¶ 17} Despite appellant's allegations otherwise, Barber, the only witness, testified that appellant was not clearing a cap jam when he was injured. On the day in question, Barber and appellant were working together operating the Prosys. Appellant was in the "operator's" position, while Barber was acting as a "facilitator." As such, appellant worked at the front of the machine, and Barber worked at the back, feeding caps into the machine. Barber could see appellant from where he was working.
 {¶ 18} Barber did not know whether appellant stopped the machine before climbing up the ladder to fix the cap jam. He saw appellant climb the ladder and then saw appellant on top of the machine. According to Barber, appellant was cleaning glue from the valve of the cylinder, which was on top of the machine, when he was injured. Barber testified that when appellant cleaned the valve, the cylinder moved upward, the crossbar moved, and appellant's head somehow became caught between the crossbar and the metal frame. This testimony is corroborated by a report written by Barber, to appellee, on the day of the incident.
 {¶ 19} Crawford testified that appellant did not need to put his head between the crossbar and the frame of the machine to fix a problem with the cylinders, and he had never seen an employee do so. He also indicated that any safety hazard resulting from a worker fixing the cylinders would pose a risk only to the worker's hand, not to any other body parts.
 {¶ 20} Appellee also presented evidence indicating that there were no previous injuries to other workers who operated the Prosys machine similar to the one sustained by appellant. The only other injury contained within the record is a worker who injured his finger while working on the Prosys.
 {¶ 21} Further, appellant put forth the affidavits of Richard Harkness ("Harkness") and Gerald C. Rennell ("Rennell"), both experts in the field of engineering. In his affidavit, Harkness stated that he inspected the machine and reviewed the deposition transcripts in this matter. Based upon his review, Harkness indicated that due to the modification to the Prosys by appellee, the crossbar could continue to move even after all energy sources were disconnected. According to these experts, the crossbar would continue to move until the machine completed its cycle and stopped, placing the crossbar at the top of the machine, in its "home" position.
 {¶ 22} As a result, both experts opined that appellee's employees were exposed to a dangerous condition, of which appellee was aware. According to Harkness, the danger was created when the employees were required to enter the safety gates to clear a jam if the crossbar was not in its "home" position at the top of the cycle. Harkness stated "[w]ith this knowledge, [appellee] required [appellant] * * * to continue to perform dangerous tasks," creating a substantial certainty of harm. Rennell reached the same conclusion in his affidavit.
 {¶ 23} Both affidavits indicate that each expert's preliminary report was attached to his affidavit; however, neither report was attached to the affidavit and made part of the summary judgment exercise.
 {¶ 24} Appellant filed a complaint against appellee on September 24, 2001, alleging that he was injured while in the course and scope of employment on February 16, 2001. Appellant alleged that he observed many cap jams in the machine on the date of the incident. Appellant stated, "[h]e opened the doors on the machine, which were designed to shut the machine off and climbed a ladder on the machine to clear another jam. The jams in the machine are a frequent and daily problem caused by misalignment of the caps on the tubes or of the tubes, all of which is known to Defendant OSI. Upon reaching the top of the machine, [appellant] cleared the jammed tube which caused the machine to cycle, trapping his head between the fill cylinder cross bar and the framework of the machine, causing him injury." He further contended, "[t]here were no guards or shields to protect him from the cross bar and the framework in the event, as happened here, the machine cycled although the shut-off doors were opened and air pressure had been reduced."
 {¶ 25} Based on these alleged facts, appellant brought forth an intentional tort claim. Mrs. Zappola claimed loss of consortium. The couple requested compensatory and punitive damages. Appellee timely answered.[4]
 {¶ 26} Appellee moved for summary judgment on July 10, 2003. Appellee argued that there existed no genuine issue of material fact that appellant could not recover on his intentional tort claim. Based upon this, appellee also argued that Mrs. Zappola could prove no set of facts entitling her to relief on her derivative claim for loss of consortium. Appellee attached to its motion an affidavit by Carl Tomsick, an employee of appellee, and excerpts from various depositions, including those of appellant, Rodriguez, Barber, and Crawford, among other employees of appellee.
 {¶ 27} Appellant and his wife filed a brief in opposition on July 31, 2003. They attached to their reply the affidavits of expert witnesses Harkness and Rennell; the affidavit of Jeff Schultze; excerpts from the deposition of Brian R. Elston, another employee of appellee; and excerpts from the deposition of Crawford. Appellee replied.
 {¶ 28} The trial court issued a September 30, 2003 judgment entry, granting summary judgment in favor of appellee.
 {¶ 29} From this judgment, appellant appeals and sets forth the following single assignment of error for our consideration:
 {¶ 30} "[1.] The trial court erred, to the prejudice of Appellants Mark and Courtney Zappola by granting OSI Sealants, Co.'s motion for summary judgment on appellants' intentional tort claim."
 {¶ 31} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co.,77 Ohio St.3d 102, 105, 1996-Ohio-336. Pursuant to Civ.R. 56, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach only one conclusion, which is adverse to the party against whom the motion is made, such party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Mootispaw v. Eckstein, 76 Ohio St.3d 383, 385, 1996-Ohio-389;Leibreich v. A.J. Refrigeration, Inc., 67 Ohio St.3d 266, 268,1993-Ohio-12; Bostic v. Connor (1988), 37 Ohio St.3d 144, 146.
 {¶ 32} Material facts are those facts that might affect the outcome of the suit under the governing law of the case. Turner v. Turner,67 Ohio St.3d 337, 340, 1993-Ohio-176, citing Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 248. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340.
 {¶ 33} A party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. Dresher v. Burt, 75 Ohio St.3d 280, 1996-Ohio-107. Accordingly, the moving party must specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id. If the moving party satisfies its initial burden under Civ.R. 56(C), the nonmoving party has the reciprocal burden to respond, by affidavit or as otherwise provided in the rule, so as to demonstrate that there is a genuine issue of fact. Id. However, if the nonmoving party fails to do so, then the trial court may enter summary judgment against that party. Id.
 {¶ 34} In appellant's first assignment of error, he argues that the trial court improperly granted summary judgment in favor of appellee. We disagree.
 {¶ 35} In Blankenship v. Cincinnati Milacron Chemicals Inc. (1982),69 Ohio St.2d 608, the Supreme Court of Ohio first recognized an intentional tort exception to the workers' compensation exclusivity doctrine by allowing employees to bring an intentional tort lawsuit against their employers. The Court later defined "intentional tort" inJones v. VIP Dev. Co. (1984), 15 Ohio St.3d 90. The Court stated that an intentional tort is "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Id. at paragraph one of the syllabus.
 {¶ 36} In subsequent decisions, the Court focused on what proof is necessary to establish intent on the part of an employer. In Van Fossenv. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, the Court held that the proof required to establish an intentional tort must be beyond that required to prove negligence or recklessness. Id. at paragraph six of the syllabus. The Court set forth a three-part test that an employee must satisfy to prevail against his employer for an intentional tort. Id. at paragraph five of the syllabus.
 {¶ 37} The test was modified in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115, where the Court held that the employee must prove: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus.
 {¶ 38} To clarify the second prong of the test, "[t]he employee need not prove that the employer had an actual subjective intent to cause the injury sustained or that the employer knew that the exact injury sustained would occur." Bee v. Toth Indus., Inc., 150 Ohio App.3d 184,2002-Ohio-6240, at ¶ 24, citing Fyffe at 117. "However, the mere knowledge and appreciation or a risk is not enough. * * * The employee must prove that the employer knew that because of the exact danger posed, the employee would be harmed in some manner similar to the injury sustained or that the employer knew that because of the exact danger posed, it was highly probable (substantially certain) that the employee would be harmed in some manner similar to the injury sustained." (Emphasis added and citations omitted.) Bee at ¶ 24, citing Fyffe.
 {¶ 39} Further, the opposing party can satisfy the third element of the test by presenting evidence that raises an inference that the employer, through its actions and policies, required the decedent to engage in that dangerous task. Hannah v. Dayton Power Light Co.,82 Ohio St.3d 482, 487, 1998-Ohio-408. {Sentence moved from end of next paragraph.}
 {¶ 40} To overcome a motion for summary judgment, an employee alleging an intentional tort must set forth specific facts to raise a genuine issue of material fact that the employer committed an intentional tort.Van Fossen at paragraph seven of the syllabus. Proof of the three elements may be made by direct or circumstantial evidence. Adams v.Aluchem, Inc. (1992), 78 Ohio App.3d 261, 264.
 {¶ 41} Turning to the instant matter, we note that appellant's claim was premised upon his argument that his head became lodged between the crossbar and the upper frame of the machine while he was fixing a cap jam on the Prosys. However, appellant admitted in his own deposition that he does not remember what happened after he reached his hand into the machine to attempt to fix the cap jam. Appellant next remembered waking up at Metro Hospital.
 {¶ 42} Despite this, Barber, who had been operating the machine with appellant, indicated that appellant was injured when, after he fixed the cap jam, he climbed further up the ladder to the top of the machine. According to Barber, when appellant was on top of the machine, appellant's head became lodged between the crossbar and the upper frame of the machine, causing injury. Barber testified that climbing to the top of the machine was prohibited by appellee. Barber stated this version of events immediately after the incident in a report to appellee, as well as in his deposition.
 {¶ 43} Appellee put forth evidence of the type listed in Civ.R. 56(C) demonstrating that that there existed no genuine issue of material fact that appellant cannot recover on his claim. Specifically, appellee put forth evidence indicating that appellant cannot satisfy the second and third prongs of the test required to establish an intentional tort.
 {¶ 44} As to the second prong, appellee put forth the deposition testimony of Barber, who testified that appellant was not clearing a cap jam when he was injured. Barber was the only witness to the event, and he indicated that appellant was on top of the machine, against company policy, when he was injured.
 {¶ 45} Appellant, however, alleges that he was injured when fixing a cap jam and that he never climbed on the top of the machine. Appellant's two experts, Harkness and Rennell, stated in their affidavits that appellant was injured when fixing a cap jam. However, neither expert's preliminary report was attached to his affidavit and made part of the summary judgment exercise.
 {¶ 46} As such, the experts' affidavits amount to unsubstantiated allegations. Mere allegations in appellant's pleadings are not enough to survive summary judgment. Dresher at 293; Jarrett v. ProgressivePreferred Ins. Co., 11th Dist. No. 2003-P-0045, 2004-Ohio-5323, at ¶27. Following Barber's testimony, there exists no genuine issue of material fact contesting that appellant was on top of the machine when the injury occurred.
 {¶ 47} We also note that there was no evidence put forth as part of the summary judgment exercise demonstrating exactly how the machine operated or how appellant was injured. Although affidavits were produced from Harkness and Rennell who stated that appellant's injury was due to the modification to the machine, their preliminary reports were not made part of the record in the summary judgment exercise. As such, we cannot ascertain what led them to their conclusions. It follows that appellant cannot demonstrate that he was injured as a result of the modification to the Prosys, which he argues created the dangerous condition. Appellant cannot substantiate his version of events or that his injury occurred as he alleged while fixing a cap jam. Appellant has not met his reciprocal burden to affirmatively demonstrate a genuine issue of material fact as to the second prong of the test to establish an intentional tort, i.e., that appellee knew that, if appellant was subjected to the alleged dangerous condition that, harm was substantially certain to occur.
 {¶ 48} We now turn to the third prong of the operative test. Appellee put forth the Barber's deposition testimony, which stated that appellee did not order appellant to engage in the acts that caused him injury. Barber testified that company policy actually prohibited workers from climbing on top of the Prosys.[5] Appellee also put forth appellant's own deposition testimony, where appellant affirmatively indicated that none of his job duties required that he climb on top of the machine or place his head between the crossbar and the upper frame of the machine.
 {¶ 49} In turn, appellant put forth his own deposition testimony and that of Crawford, stating that appellee's employees were required to fix problems as they occurred. Appellant also indicated in his deposition that, although the caps were jamming, he was told to keep production going.
 {¶ 50} Nevertheless, appellant did not put forth any evidence affirmatively indicating he was required to climb upon the machine or that he was required to "keep production going" under these circumstances. The evidence before the trial court actually demonstrated that appellant was prohibited from being on top of the machine. As such, appellant has not demonstrated that there exists a genuine issue of material fact as to the third prong of the test, i.e., that appellee required him to continue to perform a known dangerous task.
 {¶ 51} In summary, appellee put forth evidence affirmatively indicating that there existed no genuine issue of material fact that appellant could not satisfy the second and third prongs of the test to establish an intentional tort, as promulgated by the Supreme Court of Ohio in Fyffe. In reply, appellant failed to meet his reciprocal burden to affirmatively demonstrate a genuine issue of material fact as to his intentional tort claim.
 {¶ 52} The trial court properly granted summary judgment to appellee. Appellant's sole assignment of error is without merit, and we hereby affirm the judgment of the trial court.
Ford, P.J., Grendell, J., concur.
[1] Plaintiff Mark Zappola's appellate brief refers to himself and his wife, Courtney Zappola ("Mrs. Zappola"), as appellants. However, although both parties were plaintiffs in the matter, the notice of appeal reveals that only Mark Zappola appealed from the trial court's judgment. As such, we will consider him as the sole appellant.
[2] Justo Rodriguez ("Rodriguez"), who was in charge of safety at OSI, testified in his deposition that, whenever any maintenance was done on the machine, the proper procedure was to lock the machine and then push the emergency stop button and open the doors. However, Rodriguez testified that appellant missed this question on the test, and he never explained in detail the proper procedure to appellant. The proper lockout procedures were explained to appellant at a later time, which was before the incident in question.
[3] According to appellant, a cap jam could not be fixed by a worker who was standing on the floor. Appellant indicated that he had fixed hundreds or thousands of cap jams in this way, without incident.
[4] The matter is procedurally complicated, and various other defendants were named. Those defendants have been dismissed and are not relevant to the instant appeal. Further, appellee placed Wasau on notice of the complaint and filed a declaratory judgment action, requesting indemnification and defense coverage in accordance with the terms of the applicable policy. The matter pending against Wasau was consolidated with the instant matter on March 12, 2002. Wasau moved for summary judgment. The trial court granted summary judgment to Wasau, and appellant and his wife timely appealed in a companion case.
[5] Appellant alleged in oral argument that workers were permitted ontop of the machine if they needed to clean glue from that area. However,no such statement is contained within the record.